Alan Van Praag, Esq.
Edward W. Floyd, Esq.
Katherine P. Churchill, Esq. (*On the Brief / Not Admitted in SDNY*)
EATON & VAN WINKLE LLP
3 Park Avenue
New York, New York 10016-2078
(212) 779-9910
avanpraag@evw.com
efloyd@evw.com
kchurchill@evw.com

Attorneys for Petitioner / Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLENCORE AG,<br><br>                            Petitioner/Plaintiff,<br><br>           - against -<br><br>BHARAT ALUMINIUM COMPANY LIMITED, STERLITE INDUSTRIES (INDIA) LIMITED, and VEDANTA RESOURCES PLC,<br><br>                            Respondents/Defendants. | 10 Civ. 5251 (SAS) (AJP)<br><br>ECF CASE |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF APPLICATION FOR ATTACHMENT**

## INTRODUCTION AND FACTS

Petitioner/Plaintiff Glencore AG ("Glencore"), submits this memorandum of law in further support of its application for a pre-judgment order of attachment against the property of Respondents/Defendants Bharat Aluminium Company Limited ("Balco"), Sterlite Industries (India) Limited ("Sterlite") and Vedanta Resources PLC ("Vedanta") (collectively the "Defendants") and in reply to the Defendants' opposition papers.[1]

The pertinent facts are set forth in Glencore's previously filed Memorandum of Law in Support of Application for Ex Parte Order of Attachment ("Glencore's First Memorandum"), the previously filed Declaration of Edward W. Floyd, dated July 12, 2010 (the "Floyd Declaration") and the previously filed Declaration of Brian Sean Joseph Perrott, dated July 9, 2010 (the "Perrott Declaration") and the other papers on file. In the interest of brevity, the foregoing papers are incorporated herein.

## ARGUMENT

Glencore seeks an attachment pursuant to New York CPLR 6201 on the grounds that each of the defendants is a "foreign corporation not qualified to do business in the state." To obtain such an attachment order, a plaintiff must satisfy the requirements of New York CPLR 6212 which include: "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist [such as being a "foreign corporation not qualified to do business in the state"], and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."

---

[1] Previously, Sterlite (USA), Inc. was a defendant to this action. However, Sterlite (USA), Inc. has been dismissed pursuant to the provisions of Fed. R. Civ. Pro. 41(a)(1)(A).

Here, Glencore has satisfied each of the foregoing requirements as was already extensively discussed in Glencore's First Memorandum.  (Glencore's First Memorandum at 5-8).  Indeed, the Defendants only challenge Glencore's attachment application in two respects: that the alter ego and tortious interference allegations are insufficient to state a claim and that Glencore does not have probability of success on those claims.  (Defendant's Opposition Memorandum ("Opp. Memo.") at 12).  Both arguments are meritless.[2]

In general, pleadings only need to allege "'enough facts to state a claim to relief that is plausible on its face'... At this stage, the Court is not concerned with weighing the evidence which would be presented at trial." Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc., No. 05-7776, 2007 WL 1701813, at *4 (S.D.N.Y. Jun. 7, 2007) (discussing the standard to defeat a motion to dismiss under Rule 12(b)(6)) (quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007)).  Also, courts draw all inferences in the plaintiff's favor and only consider facts set forth in the complaint or in documents attached to or incorporated in the complaint.  Id.

Here, allegations sufficiently demonstrate that Glencore has claims for alter ego liability and tortious interference against Sterlite and Vedanta.  Regarding the alter ego allegations, the Defendants have taken the position that either New York law or federal common law governs but that similarities between the two standards eliminate the need for any choice of law analysis.  (Opp. Memo. at 15, n.1).  Glencore largely agrees and can succeed under either legal standard.

---

[2] The Defendants appear to make their "failure to state a claim" argument in connection with their motion to dismiss pursuant Fed. R. Civ. Pro. 12(b)(6). However, that argument also relates to the requirements of NY CPLR 6212.  Therefore, Glencore partly addresses that argument here but reserves its right to submit papers fully opposing the Defendants' 12(b)(6) motion.

However, Glencore notes that this Court has previously identified a distinction in how the two jurisdictions approach such claims. See Status International S.A. v. M&D Maritime Ltd., 994 F.Supp. 182, 186 (S.D.N.Y. 1998) (Scheindlin, J.) (observing the distinction). Specifically, "[f]ederal common law allows piercing of the corporate veil where (1) a corporation uses its alter ego to perpetrate a fraud *or* (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." Id. (emphasis in original). Conversely, New York law requires "a showing of *both* (i) domination and control, *and* (ii) use of domination to commit fraud or a wrong injuring the party seeking to pierce the corporate veil." Id. at 186, n.4 (emphasis in original); see also Cary Oil Co., Inc. v. MG Refining & Marketing, Inc., 230 F.Supp.2d 439, 458 (S.D.N.Y. 2002) (quoting Thrift Drug, Inc. v. Universal Prescription Adm'rs, 131 F.3d 95, 96 (2d Cir. 1997), for the proposition that New York veil piercing requires "'(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'").

In either event, it appears to be accepted that "control . . . [of a corporation] is the key." Wm. Passalacqua Bldrs, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138 (2d Cir. 1991). Thus, in order to evaluate the presence of control, "triers of fact are entitled to consider [several] factors... such as":

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9)

the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Bldrs, 933 F.2d at 139. However, the foregoing factors are not all inclusive and "any other pertinent factors [can be applied] to the infinite variety of situations that might warrant disregarding the corporate form.'" Id.

Here, many of the foregoing factors aptly describe the relationship between Sterlite, Vedanta and Balco. Balco is (or was) inadequately capitalized in that it would have needed a cash infusion from its parent entities in order to fund performance of the concerned contract. (Petition at ¶ 35). There is substantial overlap of senior officers and directors and such overlap includes the particular executive responsible for alumina procurement throughout the Vedanta Group (precisely the operation at issue here). (Petition at ¶ 38). The Defendants share business facilities including the specific email addresses used to communicate the Defendants' refusal to perform the contract. (Petition at ¶¶ 39-40). Balco lacks independent business discretion as exemplified by the fact that it was a Sterlite executive who heavy-handed the actions and decisions of Balco's nominal CEO during discussions with Glencore regarding the Defendants' decision to repudiate the contract. (Petition at ¶ 20-d). The Defendants do not deal at arm's length with one another given that Balco refuses to perform contractual obligations owed to unaffiliated companies but, at the same time, pays dividends and interest to Sterlite. (Petition at ¶ 37). Sterlite treats Balco's credit facilities as communal property. (Petition at ¶ 43, explaining that Balco obtained a $25 million credit facility to meet group-level capital requirements).

More importantly, Glencore alleges that Sterlite and Vedanta used their control with regard to the specific transaction at issue to cause Balco to breach its contract with Glencore. (Petition at ¶¶ 18-23). In that regard, Glencore alleges that Sterlite and Vedanta have

"management control" over Balco. (Petition at ¶ 34). Moreover, the Petition contends that Sterlite and Vedanta asserted such management control over Balco throughout the period of time during which Balco (by way of Sterlite and Vedanta executives and emails) refused to perform its contractual obligations. (Petition at ¶¶ 24 and 41). The end result is that Sterlite and Vedanta caused Balco to breach its contractual obligations by exercising their control to cause the harm complained of and, not surprisingly, benefitted from the breach. (Petition at ¶¶ 36-37). Moreover, Glencore's allegations contend that Sterlite and Vedanta's control over Balco goes beyond management control and encompasses complete domination (Petition at ¶ 31).

Thus, Glencore certainly states an alter ego claim against Sterlite and Vedanta. Glencore also has a probability of success on that claim for all of the reasons discussed previously. (Glencore's First Memorandum at 7-18). This is true regardless of whether the Court applies federal or New York law on veil piercing. Moreover, the Defendants' opposition completely fails to contradict the conclusion that Glencore has a probability of success.

Specifically, the Defendants opposition papers admit that Sterlite and Vedanta "exercise control" over Balco but argue that "management control" is somehow a distinct concept expressly limited by Balco's governing documents. (Opp. Memo. at 18). In a failing effort to support that characterization, the Defendants rely on the Shareholders Agreement ("SHA") amongst Sterlite, Balco and the Government of India. (Opp. Memo. at 16). However, nothing in the SHA would prevent Sterlite and Vedanta from completely controlling Balco.[3] Indeed, the SHA provides a detailed structure for Sterlite and Vedanta to dominate Balco. For instance, the

---

[3] Glencore's review of the SHA at this stage is necessarily limited since the excerpts introduced by the Defendants only include 16 pages from a document that totals, at least, 35 pages. Glencore submits the Court ought to disregard any arguments made by the Defendants on the basis of the SHA because Glencore has not had an opportunity to review the document in full.

SHA provides Sterlite with control over Balco's board (Rajagopal Decl., Ex. B, ¶ 4.1(a)).  The SHA further provides Sterlite with the right to nominate Balco's "chief executive officer / managing director" who "manages the daily operations . . . [and/or] business operations" of Balco.  (Rajagopal Decl., Ex. B, ¶¶ 4.1(b) and 4.7).  Indeed, the managing director's express powers include the power to "appoint and terminate any buyers, suppliers, [etc.]." (Rajagopal Decl., Ex. B, 4.7(b)).  Thus, Sterlite and Vedanta control both Balco's board and its daily business operations, including termination of suppliers like Glencore.  Also, the facts demonstrate that complete control was exercised here to cause the underlying breach.

Similarly, the Defendants argue that "Balco observes corporate formalities and separateness." (Opp. Memo. at 16).  That blanket statement is only supported by more blanket statements such as "Balco is also adequately and independently capitalized." (Id.) (discussing capitalization during FY 2010 not 2008).  However, if Balco was adequately capitalized there would not have been any need for Vedanta's Chairman to have "indicated [to Glencore's CEO] that he was not prepared to provide further cash in order for [Balco] to pay the agreed price." (Perrott Decl. at ¶ 8).

Likewise, Defendants contend that any transactions with affiliates are conducted at arm's length.  (Opp. Memo. at 17) (noting that a loan to Balco was "repaid in full together with interest set at commercial bank lending rates" as support).  Basically, the Defendants are arguing that they conduct arm's length transactions with one another because they do not breach their <u>intra-group obligations</u>.  This is meaningless.  Moreover, the Defendants fail to explain why a filing made by Sterlite with the SEC described a $25 million loan facility as having been obtained to "to meet <u>our</u> capital expenditure requirement on projects." (First Floyd Decl. at ¶ 14) (emphasis added).  The unqualified reference to "our capital expenditure requirement" shows corporate

6

debts are viewed as a group-level endeavor by the Defendants. Also, Defendants share an email

domain name (vedanta.co.uk). (Glencore's First Memorandum at 10, 17). Defendants admit this

fact but claim it is insignificant. (Opp. Memo. at 19-20). That is false. The domain is actually

registered to Vedanta Alumina Ltd. ("VAL") according to publicly available reports. (Annexed

hereto as Ex. A is a copy, in pertinent part, of such a report which has been highlighted for

reference purposes.) As the name implies, VAL is a Vedanta subsidiary, in the same line of

business as Balco, and thereby held out as competing with Balco. In reality though, Balco shares

a domain name with VAL and also shares key executives in charge of alumina procurement and

international marketing with VAL. (First Floyd Decl. at ¶ 21(d)). Thus the Defendants conduct

their aluminum business as an integrated enterprise without regard to corporate separateness.

    Additionally, the Defendants contend that Sterlite and Vedanta do not guarantee Balco's

debts. (Opp. Memo. at 17). Perhaps that is true with regard to formal guarantees. However,

Balco (whose business affairs are admittedly controlled by Sterlite and Vedanta) clearly

represents to commercial counterparties and others that its obligations are backed by Sterlite and

Vedanta. For instance, when a Balco executive first sent an email to Glencore (from the Vedanta

domain name and with copies to other Vedanta accounts) to seek a massive reduction in the

contract price, the message used the incentive of future business dealings at the "Group Level"

[i.e., Sterlite and Vedanta] for leverage. (Perrott Decl. at ¶ 7). Similarly, Balco previously

submitted a declaration (in the prior Rule B proceeding) which was overtly intended to give the

impression that Sterlite and Vedanta back Balco's obligations. (Glencore's Initial Memorandum

at 16-17). The statement provided that:

> [Balco] and its parent entities are well established, solvent, financially secure
> entities with substantial assets and revenues. In fiscal year 2008, Bharat earned
> EBITDA of $347 million on revenues of $1.17 billion and owned fixed assets

worth $1.27 billion.  Vedanta is a London listed FTSE 100 diversified metals and
mining group.  It has corporate offices in London and its operations are located
throughout India, with further operations in Zambia and Australia.  In fiscal year
2008, Vedanta earned EBITDA of $3.01 billion on revenues of $8.2 billion and
owned net assets worth $9.2 billion.  Excerpts from Vedanta's 2008 Annual
Report are annexed as Exhibit B hereto.

(Floyd Decl., Ex. 10).  What possible purpose could that statement have served other than to give

the impression that Sterlite and Vedanta backed Balco's debt to Glencore.  The statement was

designed to demonstrate the Defendants would collectively pay any arbitration award obtained

by Glencore.  Glencore obtained such an award but Balco, Sterlite and Vedanta have ignored

their obligation to pay; this is the precise reason we are before this Court.  Despite  touting their

financial viability, the Defendants have failed to pay an award which they alluded to the Court

they would have no problem satisfying if Glencore prevailed in the arbitration.  Indeed, making

such representations to federal courts is common practice for entities affiliated with the

Defendants.  In proceedings concerning Sterlite (USA)'s attempted acquisition of Asarco LLC,

Sterlite (USA)'s president submitted a declaration stating  "[i]f Sterlite were unable to generate

sufficient free cash flow or raise adequate financing to satisfy its obligations . . . I expect Sterlite

India, or its corporate parent Vedanta Resources PLC, would assist in the repayment of these

obligations."  (A copy of the pertinent portions of the declaration are annexed hereto as Ex. B.)

　　　All of the foregoing convincingly demonstrates that Glencore has a probability of success

on the merits of its alter ego claims.  Furthermore, as noted above, there are an "infinite variety

of situations that might warrant disregarding the corporate form."  Wm. Passalacqua Bldrs, 933

F.2d at 139.  Thus here, the Court should also consider that Balco, Sterlite and Vedanta each

profited from the concerned breach in which Sterlite and Vedanta were undoubtedly involved.

Moreover, Balco's profits were then directly passed on to Sterlite in the form of dividends which

8

Sterlite then uses to make: (1) interest payments on debt issued in New York that is supposed to be subordinated to Balco's trade liabilities (Glencore's First Memo. at 16); and (2) dividend payments for Sterlite's American Depositary Shares owned by Vedanta (Opp. Memo. at 10). Glencore seeks to attach the aforementioned payments and use the attached property to satisfy the Award. To the extent veil piercing is necessary to do so, such a remedy is inherently just and warranted.

For all the same reasons, Glencore's tortious interference claims also withstand the Defendants' opposition and provide an additional basis for the requested attachment order. As described by the Defendants, a claim for tortious interference requires: "'the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and . . . damages to the plaintiff." (Opp. Memo. at 24) (quoting Cenveo Corp. v. Diverspack LLC, No. 09-7544, 2009 WL 3169484, at *9 (S.D.N.Y. Oct. 1, 2009) (Scheindlin, J.)). Here, Glencore's pleadings contend that there was a valid contract, Sterlite and Vedanta knew of the contract, and Glencore suffered damages from its breach. (Petition at ¶¶ 59-61). Thus, the sole issue is whether Glencore's claim for tortious interference sufficiently alleges that Sterlite and Vedanta "intentionally procured a contract breach." Paragraph 61 of the Petition makes that claim and all of the facts discussed regarding the alter ego allegations support the same. Therefore, even if the Court considers the alter ego claim insufficient to support the attachment, Glencore still states a claim that the breach would not have occurred but for the actions of Sterlite and Vedanta.

Moreover, Defendants' arguments regarding the prior Rule B action are a red herring. That case did not give rise to collateral estoppel against Glencore's claim for tortious interference with maritime obligations. Instead, the Rule B action only held that the contract was

9

not a maritime contract. <u>Glencore AG v. Bharat Aluminum Company Limited</u>, No. 08-9765, 2008 WL 5274569, at *4 (S.D.N.Y. Dec. 15, 2008) (stating "we find that the contract here does not provide a basis for maritime jurisdiction"). Despite reaching that determination, the Court observed many maritime elements in the contract. <u>Id.</u> at 1 (stating that the contract "set forth details for the ocean transportation and delivery of the cargo, including particular vessel characteristics and specific procedures by which the defendant would approve a vessel selected by the plaintiff."). Thus, to the extent that third-parties tortiously interfered with maritime elements of the contract, those parties can be held liable for tortiously interfering with maritime obligations.

Moreover, the Court issued its decision in the Rule B action on 15 December 2008 before the arbitration commenced or the Award was issued. Therefore, considerations relevant to determining the scope of maritime obligations did not come to light until after the Rule B action was resolved. Amongst other things, the Award held that Balco's breach caused damages to Glencore, including demurrage. Thus, subsequent events have confirmed that Balco's breach of the contract caused Glencore to suffer maritime damages. Moreover, it constitutes a maritime tort to induce a contract breach which delays a vessel or prevents it from sailing with its intended cargo. <u>Carroll v. Protection Maritime Insurance Co.</u>, 512 F.2d 4, 8(1st Cir. 1975) (quoting <u>O'Connor & Co. v. City of Pascagoula</u>, 304 F.Supp. 681, 683 (S.D.Miss. 1969)). That description aptly summarizes the maritime impact of Sterlite and Vedanta's tortious interference.

## CONCLUSION

For all of the foregoing reasons, Glencore's motion for an order of attachment should be granted in its entirety along with such other relief as the Court deems appropriate.

Dated: New York, New York
       September 3, 2010

                              Respectfully submitted


                    By:    /s/ Edward W. Floyd
                           Edward W. Floyd

                           EATON & VAN WINKLE LLP
                           3 Park Avenue
                           New York, New York 10016-2078
                           (212) 779-9910

                           Attorneys for Glencore AG

11

# EXHIBIT A

- sterlite.com
- tatanova.com
- vedanta.co.in
- rediff.com
- mumdns.tatanova.com
- co.in
- masterdns.tatanova.com

Access to .IN WHOIS information is provided to assist persons in determining the contents of a domain name registration record in the .IN registry database. The data in this record is provided by .IN Registry for informational purposes only, and .IN does not guarantee its accuracy. This service is intended only for query-based access. You agree that you will use this data only for lawful purposes and that, under no circumstances will you use this data to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of Registry Operator, a Registrar, or Afilias except as reasonably necessary to register domain names or modify existing registrations. All rights reserved. .IN reserves the right to modify these terms at any time. By submitting this query, you agree to abide by this policy.

| | |
|---|---|
| Domain ID: | D8939-AFIN |
| Domain Name: | VEDANTA.CO.IN |
| Created On: | 19-Dec-2004 19:24:44 UTC |
| Last Updated On: | 09-Dec-2006 11:45:30 UTC |
| Expiration Date: | 19-Dec-2010 19:24:44 UTC |
| Sponsoring Registrar: | Rediff.com India Limited (R37-AFIN) |
| Status: | CLIENT DELETE PROHIBITED |
| Registrant ID: | R-R04121827026 |
| Registrant Name: | Vedanta Alumina Ltd. |
| Registrant Organization: | |
| Registrant Street1: | Vedanta,75 Nehru Road, |
| Registrant Street2: | Vile Parle (E) |
| Registrant Street3: | |
| Registrant City: | Mumbai |
| Registrant State/Province: | Maharashtra |
| Registrant Postal Code: | 400099 |
| Registrant Country: | IN |
| Registrant Phone: | +91.56461000 |
| Registrant Phone Ext.: | |
| Registrant FAX: | |
| Registrant FAX Ext.: | |
| Registrant Email: | singh_dk@sterlite.com |
| Admin ID: | A-R04121827026 |
| Admin Name: | Vedanta Alumina Ltd. |
| Admin Organization: | |
| Admin Street1: | Vedanta,75 Nehru Road, |
| Admin Street2: | Vile Parle (E) |
| Admin Street3: | |
| Admin City: | Mumbai |
| Admin State/Province: | Maharashtra |
| Admin Postal Code: | 400099 |
| Admin Country: | IN |
| Admin Phone: | +91.56461000 |
| Admin Phone Ext.: | |
| Admin FAX: | |
| Admin FAX Ext.: | |
| Admin Email: | singh_dk@sterlite.com |
| Tech ID: | T-R04121827026 |
| Tech Name: | Vedanta Alumina Ltd. |
| Tech Organization: | |
| Tech Street1: | Vedanta,75 Nehru Road, |
| Tech Street2: | Vile Parle (E) |
| Tech Street3: | |
| Tech City: | Mumbai |
| Tech State/Province: | Maharashtra |
| Tech Postal Code: | 400099 |
| Tech Country: | IN |
| Tech Phone: | +91.56461000 |
| Tech Phone Ext.: | |
| Tech FAX: | |
| Tech FAX Ext.: | |

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 05-21207** |
| | § | |
| **ASARCO LLC, *et al.*** | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |

## PROFFER OF C.V. KRISHNAN IN SUPPORT OF THE
## DEBTORS' PLAN OF REORGANIZATION

1.      My name is Coimbatore Venkatakrishnan ("C.V.") Krishnan, and the following information is a true and accurate statement of my direct testimony as if I were called as a witness in open court in this case. I am the President of Sterlite (USA) Inc., which I will refer to as "Sterlite." In November 2006, I became the Head of Business Development and Managing Director, Power, for Sterlite Industries (India) Ltd., which I will refer to as "Sterlite India." When referring to both entities I will refer to them as the "Sterlite Entities." My earlier assignments were:

| | | |
|---|---|---|
| February 2005 to October 2006 | : | Chief Executive Officer, Konkola Copper Mines plc., Zambia. |
| October 2003 to January 2005 | : | Chief Executive Officer of a Not-for-Profit Eye Care Hospital (Sankara Nethralaya, Medical Research Foundation, Chennai) |
| October 2001 to September 2003 | : | Chief Executive Officer, Metals, Sterlite India |
| May 1999 to September 2001 | : | Chief Executive Officer, Copper, Sterlite India |

I am at present also working on a project to set up a not-for-profit, world-class, research-driven, multi-disciplinary university in Eastern India (*i.e.*, Vedanta University).

2.      Prior to joining Sterlite India in May 1999, I was the Chief Executive Officer and Managing Director of Essar Power Limited. I have over 35 years of work

cash generated from operation of the Acquired Assets, will be greater than the remaining principal obligations under the Plan Sponsor Promissory Note at the maturity of the note.

16.   If Sterlite were unable to generate sufficient free cash flow or raise adequate financing to satisfy its obligations under the Put Agreement or the Plan Sponsor Promissory Note, scenarios I believe to be extremely improbable, I expect Sterlite India, or its corporate parent Vedanta Resources PLC, would assist in the repayment of these obligations. Sterlite's direct and indirect parent entities would be motivated to do so in order to preserve the remaining value of the Acquired Assets. Furthermore, Vedanta Resources PLC would be motivated to avoid triggering the cross-default provisions in their $1.25 billion outstanding 2014 and 2018 bonds.   See Offering Circular dated June 25, 2008, at page 214, a copy of which is annexed hereto, and incorporated herein, as Exhibit G.

17.   As described in greater detail above, Sterlite very likely will generate substantial operating profits and will have other available funds sufficient to satisfy payments required under the Put Option and the Plan Sponsor Promissory Note, and to ensure the continued financial and operational viability of the Acquired Assets.

18.   Sterlite will be acquiring substantial working capital assets in connection with the acquisition of the Acquired Assets. Sterlite intends to evaluate its immediate working capital needs to ensure optimal performance of the Acquired Assets and Sterlite India intends to infuse fresh capital on or around the time of closing for initial liquidity purposes. Additionally, in the event current profits and available cash are not sufficient to meet the ongoing working capital needs of Sterlite on a post-acquisition basis, I expect that Sterlite India will fund such working capital requirements on an "as- needed" basis through either an intercompany loan or an equity injection.